HARTZ, Circuit Judge.
The federal government subsidizes the cost of family-planning services for low-income individuals through Title X of the Public Health Service Act. It often grants Title X funding directly to a state, which in turn makes subgrants to family-planning service providers. Kansas is one such state.
In May 2011 Kansas Governor Sam Brownback signed into law an appropriations bill restricting the classes of entities eligible for Title X subgrants. It limits the recipients to public entities, hospitals, and federally qualified health centers that provide comprehensive primary and preventative healthcare services. This restriction disqualified two family-planning clinics operated by Planned Parenthood of Kansas and Mid-Missouri (Planned Parenthood). Planned Parenthood sued Governor Brownback and Robert Moser, M.D., in his capacity as the Secretary of the *817 Kansas Department of Health and Environment (KDHE), challenging the legislation on the grounds (1) that it violates Title X and is therefore unconstitutional under the Supremacy Clause; (2) that it violates Planned Parenthood’s First Amendment rights by penalizing it for associating with providers of abortion and for its advocacy of access to abortion services; and (3) that it violates the Fourteenth Amendment by imposing an unconstitutional burden on the rights of women to choose abortion (a claim not raised on appeal). Ruling that Planned Parenthood had established a likelihood of success on the merits of the first two claims and had otherwise satisfied the requirements for a preliminary injunction, the district court enjoined KDHE from implementing the legislation.
Moser challenges the injunction on several grounds, most of which we need not address. As to the Supremacy Clause claim, we hold that Planned Parenthood cannot establish a likelihood of success on the merits because there is no private cause of action for injunctive relief for the alleged violation of Title X. Although Planned Parenthood and the dissent assert that the view we adopt is contrary to circuit precedent in Chamber of Commerce of U.S. v. Edmondson, 594 F.3d 742, 764 (10th Cir.2010), and Qwest Corp. v. City of Santa Fe, 380 F.3d 1258 (10th Cir.2004), this opinion does not call into question the validity of the injunctions affirmed by those two decisions. Our holding is much narrower than what the dissent suggests. We hold only that when actual or threatened state action is allegedly contrary to a federal statute, the Supremacy Clause does not necessarily (it is a matter of statutory interpretation that depends on the specifics of the federal statute) authorize an injunction against the state action when four conditions are all satisfied: (1) the statute does not specifically authorize injunctive relief, (2) the statute does not create an individual right (which may be enforceable under 42 U.S.C. § 1983), (3) the statute is enacted under the Constitution’s Spending Clause, and (4) the state action is not an enforcement action in adversary legal proceedings to impose sanctions on conduct prohibited by law.
As to the First Amendment claim, we hold that Planned Parenthood cannot establish a likelihood of success because the legislation does not restrict the rights of speech or association of subgrantees and the motives of individual lawmakers are irrelevant.
After summarizing the relevant background of this case, we will set forth the reasoning behind our two holdings, distinguishing the cases relied on by Planned Parenthood and the dissent. We then vacate the preliminary injunction, reverse, and remand for further proceedings.
I. BACKGROUND
A. Overview of Title X
In 1970 Congress passed the Family Planning Services and Population Research Act (Act). See Pub.L. No. 91-572, 84 Stat. 1504 (1970). The Act’s stated purposes include “assisting] in making comprehensive voluntary family planning services readily available to all persons desiring such services.” Id. § 2, 84 Stat. at 1504. It established the Office of Population Affairs (OPA), the responsibilities of which include “administering] all Federal laws ... which provide for or authorize the making of grants or contracts related to ... family planning programs.” Id. §§ 3— 4, 84 Stat. at 1504-05; 42 U.S.C. § 3505b(l). OPA resides within the Department of Health and Human Services (HHS). See 42 U.S.C. § 3505a(a).
Of particular relevance to this appeal, the Act amended the Public Health Service *818 Act, Pub.L. No. 410, 58 Stat. 682 (1944), to add a new title: “Title X — Population Research and Voluntary Family Planning Programs” (Title X). Pub.L. No. 91-572, § 6, 84 Stat. 1504, 1506-08 (codified at 42 U.S.C. §§ 300-300a-6). Title X facilitates the provision of family-planning services by federally subsidizing such services. It authorizes the Secretary of HHS:
to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents).
42 U.S.C. § 300(a). Title X is relatively sparse, consisting of just a few short provisions. It mostly confers executive authority. It authorizes the HHS Secretary to make grants for various purposes related to family planning. See id. § 300(a) (family-planning project grants); id. § 300a(a) (formula grants to state health authorities); id. § 300a-l(a) (training grants); id. § 300a-2 (research grants); id. § 300a-3 (grants for educational materials). And it gives the Secretary authority to determine the amounts of grants, see id. § 300a-4(a), the conditions to which grants are subject, see id. § 300a-4(b), and whether projects satisfy the statutory eligibility requirements, see id. § 300a-4(c).
Under Title X, “[ljocal and regional entities shall be assured the right to apply for direct grants and contracts ..., and the Secretary shall by regulation fully provide for and protect such right.” Id. § 300(b); see also id. § 300a-4(a) (authority to promulgate regulations governing grants). The regulations thus provide that “[a]ny public or nonprofit private entity in a State may apply for a grant under this subpart.” 42 C.F.R. § 59.3. The regulations detail the application process and the requirements of a Title X project. See id. §§ 59.4, 59.5. HHS provides successful applicants with a “notice of grant award,” which informs the grantee how long HHS intends to fund the project before requiring the grantee to recompete for funding. Id. § 59.8. Although this period typically lasts three to five years, the initial grant is usually for only one year; the grantee must submit subsequent applications for “continuation awards” each year, subject to “consideration of such factors as the grantee’s progress and management practices, and the availability of funds.” Id.
Direct Title X grantees need not provide family-planning services themselves but may contract to have the services provided “by delegate/contract agencies operating under the umbrella of the grantee” (delegate agencies). U.S. Dep’t of Health & Human Servs., Office of Pub. Health & Sci., Office of Population Affairs, Program Guidelines for Project Grants for Family Planning Services § 6.1 (2001) (Program Guidelines). But the direct grantee remains “responsible for the quality, cost, accessibility, acceptability, reporting, and performance of the grant-funded activities provided by delegate/contract agencies.” Id.; see also Marilyn J. Keefe, Deputy Assistant Sec’y for Population Affairs, Dep’t of Health & Human Servs., Memorandum on Title X Grantee Compliance with Grant Requirements and Applicable Law 2 (March 1, 2011) (“Title X grantees are responsible for conducting periodic reviews of sub-recipient agencies, and must undertake immediate steps to address issues related to lack of compliance with established policies and procedures.”). Although Title X also authorizes direct federal grants to service providers, see Program Guidelines § 6.1, “[m]ost Title X funds flow initially to state and local governmental agencies and non-profit organizations [, *819 which] function as intermediaries that in turn distribute the funds to subgrantees who actually administer the programs.” Nat’l Family Planning & Reproductive Health Ass’n, Inc. v. Gonzales, 468 F.3d 826, 828 (D.C.Cir.2006).
The Title X regulations cross-reference “HHS Department-wide regulations,” which apply to Title X grants. 42 C.F.R. § 59.10. The referenced regulations include 42 C.F.R. pt. 50 and 45 C.F.R. pts. 16, 74, and 92, which create an administrative scheme for HHS grants and cooperative state-federal funding agreements. The scheme, promulgated primarily under the general grant of authority to heads of executive agencies, see 5 U.S.C. § 301, provides for centralized executive enforcement of Title X. It states, “If a grantee or subgrantee materially fails to comply with any term of an award, whether stated in a Federal statute or regulation, an assurance, in a State plan or application, a notice of award, or elsewhere, the awarding agency may” temporarily withhold payments, disallow funding to cover the cost of the noncomplying activities, terminate the award, withhold further awards, or pursue other legally available remedies. 45 C.F.R. § 92.43(a). A grantee subjected to an adverse determination may request an informal review of the decision before the agency. See 42 C.F.R. §§ 50.404(a) (defining adverse determination), 50.405 (authorizing review committees to review adverse determinations), 50.406 (setting forth steps in administrative review process). A grantee may appeal an adverse final decision to the Departmental Appeals Board. See 45 C.F.R. §§ 16.3 (requirements for appeal to be heard by the board), 16.7-.8 (steps in initiating appeals process). And a grantee may seek judicial review under the Administrative Procedure Act (APA) of a final agency decision. See 5 U.S.C. § 704; see also 45 C.F.R. § 74.90(c)-(d) (requirements for final decisions in HHS disputes).
In Kansas, HHS grants Title X funds to the State, which distributes the funds to delegate agencies. The State applies directly to HHS for Title X funds through KDHE, which is the sole direct grantee in Kansas. ■ Most recently, KDHE submitted a competitive grant application on February 22, 2010, requesting funds for the five-year period from June 30, 2010, through June 29, 2015. KDHE applied for a continuation grant on March 21, 2011, and the notice of grant award was issued on June 27, 201Í. KDHE provides no family-planning services itself, but instead contracts with delegate agencies.
Before the events giving rise to this litigation, those delegate agencies included Planned Parenthood. Planned Parenthood had received Title X funds under contract with KDHE for over 25 years. Because KDHE included Planned Parenthood in its application for the 2010-15 grant, Planned Parenthood did not apply to HHS for a direct grant. Although Planned Parenthood does not provide abortion services at the Wichita and Hays clinics, which have been subgrantees, it provides the services in two clinics in Missouri and is affiliated with Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, which provides them in Overland Park, Kansas.
B. Section 107(1)
On May 28, 2011, Governor Brownback signed into law Senate Substitute for House Bill 2014, an appropriations bill containing the provision at issue. Section 107(Z) of the law provides:
During the fiscal year ending June 30, 2012, subject to any applicable requirements of federal statutes, rules, regulations or guidelines, any expenditures or grants of money by the department of *820 health and environment — division of health for family planning services financed in whole or in part from federal title X moneys, shall be made subject to the following two priorities: First priority to public entities (state, county, local health departments and health clinics) and, if any moneys remain, then, Second priority to non-public entities which are hospitals or federally qualified health centers that provide comprehensive primary and preventative care in addition to family planning services: Provided, That, as used in this subsection “hospitals” shall have the same meaning as defined in K.S.A. 65-425, and amendments thereto, and “federally qualified health center” shall have the same meaning as defined in K.S.A. 65-1669, and amendments thereto.
Aplt. App., Vol. I at 31 (30 Kan. Reg. 793 (June 9, 2011)).[1] Thus, only (1) public entities and (2) nonpublic hospitals and federally qualified health centers (FQHCs) may become delegate agencies of KDHE, with public entities receiving priority. Kansas law adopts the definition of FQHC set forth in 42 U.S.C. § 1396d(l). See Kan. Stat. Ann. § 65-l669(e) (2008). Section 1396d(l), in turn, provides that an FQHC is an entity that is receiving or satisfies the requirements to receive a grant under 42 U.S.C. § 254b. See 42 U.S.C. § 1396d(l)(2)(B). And to be eligible for a grant under § 254b, an entity must provide a range of primary health services. See id. § 254b(a)(l)(A), (b)(1)(A).
All agree that the two categories of eligible entities under § 107(Z) do not include Planned Parenthood, an operator of private, specialized family-planning clinics. Accordingly, KDHE notified Planned Parenthood by letter dated June 14, 2011, that Title X funding would not be available in the upcoming fiscal year through its contract with KDHE. KDHE then sought or procured new or expanded contracts with other service providers satisfying the requirements of § 107(0 to serve the geographical areas previously served by Planned Parenthood, but the district court’s preliminary injunction in this litigation halted KDHE’s efforts.
C. Procedural History
On June 27, 2011, Planned Parenthood filed suit in the United States District Court for the District of Kansas seeking declaratory and injunctive relief. The complaint alleged three counts: (1) that § 107(Z) violates, and is therefore preempted by, Title X because it places eligibility restrictions on the receipt of funding in excess of and inconsistent with those imposed by federal law; (2) that § 107(Z) violates the First Amendment by penalizing Planned Parenthood for associating with abortion providers and advocating for access to abortion services; and (3) that § 107(Z) violates the Fourteenth Amendment by penalizing the provision of, and association or affiliation with, abortion services, thereby burdening the right to choose abortion. The complaint named as *821 defendants both Moser and Brownback, in their official capacities, but the parties have since dismissed Brownback with prejudice by stipulation. Planned Parenthood sought a preliminary injunction against the implementation of § 107(i).
On August 1, 2011, the district court granted a preliminary injunction. The court decided (1) that § 107(£) imposes eligibility requirements that render-it “certain that Planned Parenthood cannot successfully participate in Title X funds,” Aplt. App., Vol. Ill at 473 (Memorandum & Order at 24, Planned Parenthood of Kan. & Mid-Mo. v. Brownback, No. 11-2357-JTM (D.Kan. Aug. 1, 2011) (Mem. Op.)); and (2) that the purpose and effect of § 107(i) is to bar Planned Parenthood, “an entity associated with abortion[,] from the benefit of federal funding for which it would be otherwise eligible.” Id. at 480 (Mem. Op. at 31). It therefore ruled that Planned Parenthood had demonstrated a likelihood of success on the merits of its Supremacy Clause claim and its claim that § 107(() infringed on its constitutional rights of association. The court weighed the other three factors required for a preliminary injunction — the risk of irreparable injury to the plaintiff, whether the threatened injury outweighs the injury to the opposing party from an injunction, and whether the-injunction would be adverse to the public interest, see Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir.2012) — and ruled that each favored Planned Parenthood. Accordingly, it enjoined “any further enforcement or reliance on Section 107(Z)” and ordered Moser “to allocate all Title X funding for State Fiscal Year 2012 without reference to Section 107(().” Aplt. App., Vol. III at 485 (Mem. Op. at 36). The court did not address the Fourteenth Amendment claim based on the right to choose abortion, and that claim is not at issue in this appeal.
Moser filed an interlocutory notice of appeal challenging the preliminary injunction. He raises several grounds for reversal: (1) that neither a § 1983 action nor an equitable cause of action is available to raise Planned Parenthood’s Supremacy Clause claim;[2] (2) that even if the Supremacy Clause supplies a cause of action, Planned Parenthood lacks prudential standing to assert HHS’s exclusive entitlement to enforce Title X; (3) that the district court erred in finding that Planned Parenthood is likely to succeed on the merits of its claims; (4) that the court improperly weighed the other factors required for injunctive relief; and (5) that the injunction exceeds the limited exception to state sovereign immunity recognized by the Supreme Court in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (allowing injunctive relief against state officials violating federal rights). Planned Parenthood responds that the district court properly evaluated each of the four considerations for granting injunctive relief, including the likelihood of success on the merits. It further contends that it has a cause of action under the Supremacy Clause (although it does not claim to have a cause of action under § 1983), that it has standing to assert its claims, and that the injunction does not infringe the State’s sovereign immunity-
II. DISCUSSION
We have jurisdiction under 28 U.S.C. § 1292(a)(1), which authorizes ap *822 pellate review of a district court’s interlocutory order granting a preliminary injunction. “We review the district court’s grant of a preliminary injunction for abuse of discretion. A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings.” Edmondson, 594 F.3d at 764 (citation and internal quotation marks omitted). If the claims by the party seeking injunctive relief have no merit, granting relief is an abuse of discretion. See Flood v. Clear-One Commc’ns, Inc., 618 F.3d 1110, 1111 (10th Cir.2010).
A. Supremacy Clause Claim 1. Likelihood of Success on the Merits
The district court agreed with Planned Parenthood that it had shown a likelihood of success on its Supremacy Clause claim. In the court’s view, “Congress foreclosed states participating in Title X from creating additional, narrower standards for application.” Aplt. App., Vol. Ill at 476 (Mem. Op. at 27). It explained that § 107(i) created such a standard, “completely excluding a class of entities who are otherwise qualified under federal law for Title X participation.” Id. at 477 (Mem. Op. at 28). Thus, it concluded, § 107(Z) “is in direct conflict with federal law and is unconstitutional.” Id. It therefore enjoined Moser from applying the statute.
Moser contests this ruling. He argues that § 107(i )’s scheme of prioritizing funding to public and full-service healthcare providers is consistent with the Congressional policy of facilitating the provision of services to low-income patients. He further argues that although Title X contemplates broad eligibility for direct grants, nothing in the statute prevents a direct grantee from imposing additional eligibility criteria for subgrants. And he insists that the State can simultaneously comply with both Title X and § 107(i). We need not reach those issues, however, because Mos-er prevails on another ground: Planned Parenthood lacks a cause of action to assert its claim for injunctive relief.
a. Cause of Action for Injunctive Relief
Planned Parenthood does not claim that its cause of action is under 42 U.S.C. § 1983. Nor does it claim that Title X expressly authorizes its suit. It relies solely on its contention that the Supremacy Clause itself gives it the right to seek an injunction against state or local law inconsistent with Title X.
We disagree. We hold that, regardless of whether § 107(0 is inconsistent with Title X, Planned Parenthood does not have a private cause of action for injunctive relief under the Supremacy Clause. Our reasons, which we discuss more fully below, can be summarized as follows: Whether to recognize a private cause of action for injunctive relief is a matter of statutory interpretation. And we cannot infer such a cause of action from Title X. HHS, the expert federal agency charged by Congress with administering Title X, has ample power to enforce the requirements of the law; private suits for injunc-tive relief can undermine the advantages of uniformity and expertise provided by HHS supervision; Title X does not clearly notify States that they are subject to such suits; implementation of § 107(2) does not constitute state enforcement action forbidding Planned Parenthood from acting as it wishes (as opposed to state action complying with legislation simply denying subsidies for that activity); and private suits for injunctions are not traditionally implied in statutes enacted under the Constitution’s Spending Clause, U.S. Const, art. I, § 8, cl. 1. The remedy for a State’s violation of *823 Title X is action by HHS, which can then be judicially reviewed under the Administrative Procedure Act, 5 U.S.C. §§ 701-06. We explain.
The Supremacy Clause provides: “This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ..., shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const; art. VI, cl. 2. It declares that when state or local law conflicts with federal law, federal law prevails. It does not, however, tell us what that federal law is. This proposition may seem obvious, but the point might be overlooked when one considers what remedies are available under federal law.- A statute declaring what the substantive rule is does not necessarily endorse every potential remedy for violation of that rule. For example, a statute may not allow recovery of punitive damages, see, e.g., 42 U.S.C. § 2210(s) (Price-Anderson Act), may not allow damages for emotional distress, see, e.g., id. § 1997e(e) (restricting right of prisoner to recover damages for emotional or mental injury under 42 U.S.C. § 1983), or may not allow any damages at all, see, e.g., United States v. Johnson, 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987) (restricting right of service members to sue under Federal Tort Claims Act).
Planned Parenthood suggests that the Supremacy Clause requires that whenever a state statute conflicts with federal law, a private person harmed by the statute can obtain an injunction in federal court to prohibit the operation of the statute. True, there are occasions when such injunctions can be obtained. But not always. For example, under the doctrine established in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), certain state-court proceedings, such as ongoing criminal prosecutions, cannot be enjoined despite allegations that the statute underlying the proceeding violates the federal Constitution. And the Tax Injunction Act (TIA), 28 U.S.C. § 1341, ordinarily forbids a federal court from enjoining the collection of a state tax even if it allegedly violates federal law. See Rosewell v. La-Salle Nat’l Bank, 450 U.S. 503, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981). We doubt that anyone would suggest that the.Supremacy. Clause authorizes an injunction barred by the TIA. After all, the federal law that is supreme is a statute forbidding the injunction. Granting an injunction “under the Supremacy Clause” would undermine Congress’ statutory command, not effectuate it.
Determining what remedies are available ‘for violations of a statute is a matter of statutory construction. Cf. Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (“The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just the private right but also a private remedy.”). The statute may 'make the task easy by spelling out the remedies. But a court may havé to infer whether or not a remedy is available by using traditional methods of statutory construction. This is true regardless of what remedy is in question, be it punitive damages, compensation for emotional distress, or injunctive relief. The answers are not the same for every statute; and the answers may differ depending on the remedy (for example, in-junctive relief may be implied when a damages remedy is not). But the Supremacy Clause does not provide the answers. It does not tell us how to interpret federal statutes. It proclaims only that the federal statute, once interpreted, prevails over state or local law.
*824 Deciding whether injunctive relief is available can sometimes be straightforward. For example, when a federal statute creates a personal right, Congress has provided an injunctive remedy in 42 U.S.C. § 1988, which states:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,....
(emphasis added); see Mitchum v. Foster, 407 U.S. 225, 242, 92 S.Ct. 2151, 82 L.Ed.2d 705 (1972) (“Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a ‘suit in equity’ as one of the means of redress.”). Even then, however, injunc-tive relief under § 1983 may not be appropriate. The remedial scheme of the statute creating the right may be exclusive, see City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120-27, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005), or equitable principles may limit the right to an injunction, see Younger, 401 U.S. at 49-55, 91 S.Ct. 746; Sprint Commc’ns, Inc. v. Jacobs, — U.S. -, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013).
The test can be more challenging when the federal statute does not create a personal right. We need not provide here a test to resolve in all circumstances when there is a cause of action for injunctive relief even though no personal right is created by the federal statute allegedly violated by the State. We need analyze only whether there is such a cause of action under Spending Clause legislation of the type involved here. Our analysis persuades us that Planned Parenthood has no cause of action under Title X to enjoin the application of § 107(Z).
First, in deciding whether Congress intended to create an injunctive remedy, we look to see what other remedies are available for violation of the federal law. When the law is Spending Clause legislation such as Title X, there is a powerful alternative remedy available to deter and sanction violations. Congress has appropriated money and, within limits, see Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2601-07, 183 L.Ed.2d 450 (2013), can require the States to comply with certain conditions in return for accepting some of that money. Inherent in such legislation is the power of the purse to assure compliance. That is certainly the case here. The provision of Title X allegedly violated by § 107(i) directs how grantees of Title X funds must spend money appropriated by Congress. If HHS, which administers the grants, thinks that the money is being misspent, it can refuse to give more funds to Kansas and even clawback money that Kansas has misspent. See 45 C.F.R. § 92.43(a).
Second, we ask whether permitting private persons to seek injunctive relief for alleged violations of Title X would substantially interfere with the administration of the program by HHS. In our view, it would. HHS has deep experience and expertise in administering Title X, and the great breadth of the statutory language suggests a congressional intent to leave the details to the agency. Although Planned Parenthood may be confident that § 107(i) is inconsistent with Title X, HHS may disagree, completely or in part. Absent private suits, HHS can maintain uniformity in administration with centralized control. If private suits were allowed, however, interpretation of Title X could be *825 in the hands of numerous courts. Rather than having a uniform rule enunciated by the agency in interpreting and applying federal law, different courts could impose disparate rules depending on which state is expending the appropriated funds. Of course, administrative actions taken by HHS will often be reviewable under the Administrative Procedure Act, but only after the federal agency has examined the matter and had the opportunity to explain its analysis to a court that must show substantial deference. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
The advantages of such centralized, expert administration do not appear to be controversial and would be obvious to Congress. As the Supreme Court wrote in denying a private cause of action for damages under 42 U.S.C. § 1983 and the Family Educational Rights and Privacy Act, “It is implausible to presume that the same Congress [that created a centralized administrative enforcement scheme] nonetheless intended private suits to be brought before thousands of federal- and state-court judges, which could only result in the sort of ‘multiple interpretations’ the Act explicitly sought to avoid.” Gonzaga Univ. v. Doe, 536 U.S. 273, 290, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Justice Breyer concurred, saying:
Congress may well have wanted to make the agency remedy that it provided exclusive — both to achieve the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking and to avoid the comparative risk of inconsistent interpretations and misin-centives that can arise out of an occasional inappropriate application of the statute in a private action for damages.
Id. at 292, 122 S.Ct. 2268 (Breyer, J., concurring). And Chief Justice Roberts recently made the following observation about legislation similar to Title X:
The Medicaid Act commits to the federal agency the power to administer a federal program; the agency is comparatively expert in the statute’s subject matter; the language of the particular provision at issue here is broad and general, suggesting that the agency’s expertise is relevant; and APA review would provide an authoritative judicial determination. Allowing for both Supremacy Clause actions and agency enforcement threatens potential inconsistency or confusion, and imperils the uniformity that Congress intended by centralizing administration of the federal program in the agency....
Douglas v. Indep. Living Ctr. of S. Cal., Inc., — U.S.-, 132 S.Ct. 1204, 1214-15, 182 L.Ed.2d 101 (2012) (Roberts, C.J., dissenting) (citations and internal quotation marks omitted); see also United States v. Hohri, 482 U.S. 64, 71-73, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (observing that the advantage of national uniformity is one reason why breach-of-contract suits against the government must ordinarily be brought in the Court of Claims and are reviewable only in the Federal Circuit).
Moreover, an important, and apparently desirable, feature of supervision of spending programs by federal agencies is the play in the joints — the flexibility— of administrative enforcement. State and local governments can negotiate compromises, even obtain waivers, from the federal agency. Courts have much more limited authority in that regard. This feature of administrative enforcement is of particular moment because of the special nature of Spending Clause legislation. In the federal-grant context, the State is more a partner than a subordinate of the *826 federal government, and this relationship limits the authority of the courts to devise remedies. The State should be informed of what its burdens are before it accepts the federal funds and assumes the concomitant responsibilities. “[L]egislation [such as Title X] enacted pursuant to the spending power is much in the nature of a contract,” and “if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.” Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). By accepting federal funding, States necessarily agree to be subject to applicable federal administrative procedures. That is, they submit to federal executive authority and acknowledge that the executive authority can pursue remedies — usually concerning funding — for violations of the federal scheme. Such remedies are part of any contractual arrangement. But that is a far different burden on the States than being answerable in court to potentially numerous private parties seeking to enjoin the operation of state law. States, being political animals, likely prefer placing enforcement power exclusively with a federal agency, in part because of its flexibility and the opportunity for negotiation; and they likely expect that to be the exclusive enforcement power. We should not impose on the States the burden of private suits unless the Spending Clause legislation “unambiguously” so requires. Id.
A third consideration is the nature of the harm suffered by the private person as a result of a violation of the federal statute. It is one thing if the State prohibits the person from engaging in conduct protected by the federal law. It is another if, as with § 107(i), the State only declines to subsidize the conduct. There is a qualitative difference between prohibiting an activity and refusing to subsidize it. The Supreme Court, for instance, has drawn that line in rejecting state laws prohibiting certain abortions but not laws refusing to provide funds for the practice. See Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). And it has held that protected speech does not need to be subsidized by the government. See Regan v. Taxation with Representation of Wash., 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (“Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for TWR’s lobbying.”) True, denial of a subsidy can create hardship, even great hardship, and Congress may well decide that the hardship is sufficiently significant that a person denied the subsidy should have a judicial remedy. But Planned Parenthood does not suggest that Title X granted it an individual right, which could be enforced under § 1983.
Finally, we look to tradition. We assume that Congress enacts legislation aware of a judicial tradition interpreting similar statutes. For example, equitable tolling is generally read into a federal statute of limitations even when not expressed in the statute’s language. See Holland v. Florida, 560 U.S. 631, 130 S.Ct. 2549, 2560-62, 177 L.Ed.2d 130 (2010). Relevant to this case, there is no tradition of recognizing a private party’s right to in-junctive relief against a state law that is contrary to Spending Clause legislation not creating a personal right. There is no reason to assume that the Congress that enacted Title X anticipated creation of such a remedy.
We find significant support for our analysis in a recent Supreme Court dissent by Chief Justice Roberts, joined by three other Justices and not challenged by any other Justice on this point. In Douglas, 132 S.Ct. at 1211, Medicaid providers and ben *827 eficiaries had sued to enjoin amendments to California’s Medicaid plan that reduced payments to the providers. See id. at 1208-09. They argued that the amendments were preempted because the amended plan did not “ ‘enlist enough providers’ to make Medicaid ‘care and services’ sufficiently available,” as required by the Medicaid Act. See id. at 1209 (quoting 42 U.S.C. § 1896a(a)(30)(A)). The Ninth Circuit held that the plaintiffs could sue to enforce § 1396a(a)(30)(A) under the Supremacy Clause, because state-plan amendments that conflict with the Medicaid Act are invalid. See id.; id. at 1211-12 (Roberts, C.J., dissenting). After oral argument in Douglas, the federal Center for Medicare and Medicaid Services (CMS) approved the challenged amendments. See id. at 1209. Then, instead of reaching the merits, the Court remanded for the Ninth Circuit to consider in the first instance whether the plaintiffs could maintain their Supremacy Clause action after CMS had acted and a suit under the APA would be available. See id. at 1211.
Chief Justice Roberts, joined by Justices Scalia, Thomas, and Alito, would have decided that the plaintiffs lacked a cause of action. Noting that the statute did not authorize the suit, he explained that “as this case comes to us, the federal rule is that Medicaid reimbursement rates must meet certain criteria, but private parties have no statutory right to sue to enforce those requirements in court.” Id. at 1212 (Roberts, C.J., dissenting). He then concluded that the Supremacy Clause provides no cause of action. See id. He observed that unlike other constitutional provisions, the Supremacy Clause itself creates no federal rights, but merely “ensure[s] that, in a conflict with state law, whatever Congress says goes.” Id. Thus, he reasoned, it is not the role of the Supremacy Clause to supply a cause of action to enforce a federal statute if Congress did not intend to do so. See id. at 1212-13. To hold otherwise, he observed, “would effect a complete end-run around [the] Court’s implied right of action and [§ 1983] jurisprudence.” Id. at 1213. The Chief Justice found unavailing the plaintiffs’ appeal to “the traditional exercise of equity jurisdiction.” Id. For a court to recognize an equitable cause of action when Congress chose not to supply one, he argued, “would raise the most serious concerns regarding both the separation of powers (Congress, not the Judiciary, decides whether there is a private right of action to enforce a federal statute) and federalism (the States under the Spending Clause agree only to conditions clearly specified by Congress, not any implied on an ad hoc basis by the courts).” Id. The dissent’s reasoning is sound.
Turning to the specifics of Title X, the statutory scheme indicates that the reasons for not recognizing private actions for injunctive relief operate with full force. The statute clearly contemplates that grants will be administered under the supervision of HHS. It provides that “[g]rants under [Title X] shall be ... subject to such conditions as the Secretary [of HHS] may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made,” 42 U.S.C. § 300a-4(b); it contains no provision for private enforcement; and it delegates authority to HHS to establish the regulatory scheme for enforcement, see 42 C.F.R. § 59.10; 45 C.F.R. §§ 74.62, 74.73, 92.43, 92.52. When a statute rests all enforcement authority in a federal agency, never mentioning the possibility of private litigation, the natural inference is that Congress favored centralized enforcement, with the courts getting involved only through the deferential oversight provided by the APA.
*828 We find persuasive Chief Justice Roberts’s analysis of the quite similar circumstances presented in Douglas:
The Medicaid Act commits to the federal agency the power to administer a federal program; the agency is comparatively expert in the statute’s subject matter; the language of the particular provision at issue here is broad and general, suggesting that the agency’s expertise is relevant; and APA review would provide an authoritative judicial determination. Allowing for both Supremacy Clause actions and agency enforcement threatens potential inconsistency or confusion, and imperils the uniformity that Congress intended by centralizing administration of the federal program in the agency.... [I]n light of all this, ... the Supremacy Clause challenge appears at best redundant, and [the] continuation of the action in that form would seem to be inefficient.
132 S.Ct. at 1214-15 (Roberts, C.J., dissenting) (citations and internal quotation marks omitted).
In our view, Title X does not “display[ ] an intent to create” the remedy sought by Planned Parenthood under the Supremacy Clause. Alexander, 532 U.S. at 286, 121 S.Ct. 1511. On the contrary, the message of the statutory scheme is that statutory requirements should be enforced through the administering agency. Supporting this view is the opinion by the Seventh Circuit in Planned Parenthood of Indiana, Inc. v. Comm’r of Indiana State Department of Health, 699 F.3d 962 (7th Cir.2012). Although it relied on other grounds to reject a claim under the Medicaid Act virtually identical to the one presented here, it noted that, for the reasons set forth in Chief Justice Roberts’s dissent, it was “not inclined to agree” with the proposition that the Supremacy Clause supplied a right of action for injunctive relief. Id. at 983. Similarly, the Massachusetts Supreme Judicial Court has adopted the dissent in Douglas. See Bos. Med. Ctr. Corp. v. Sec’y of Exec. Office of Health & Humans Servs., 463 Mass. 447, 974 N.E.2d 1114, 1127-28 (2012).
b. Distinguishing Planned Parenthood’s Cases
Planned Parenthood argues that our conclusion is contrary to binding precedent. But it cites to no decision of the Supreme Court or this court holding that when a state (or local) law is contrary to a federal statute not conferring a personal right, a person can bring a claim under the Supremacy Clause to enjoin operation of the state law even when (1) the federal law is Spending Clause legislation and (2) the state law does not subject the person to an adversary enforcement action prohibiting the person from engaging in particular conduct. Before showing why the decisions cited by Planned Parenthood are far from binding in this case, we discuss why we should distinguish cases in which the federal statute invoked is Spending Clause legislation and the person seeking injunc-tive relief is not facing an enforcement action.
It should be apparent from our prior discussion why courts should distinguish cases in which the allegedly preempting statute is Spending Clause legislation. In that circumstance the federal government’s power of the purse gives it a very effective means for ensuring that federal law is honored. The availability of that effective means makes it unnecessary to also recognize remedies (such as private suits for injunctive relief) that can interfere with important policies such as reb-anee on the experience and expertise of administrative agencies and uniformity of interpretation of the law. Additionally, when construing Spending Clause legisla *829 tion (which is of a quasi-contractual character) courts should be reluctant to infer a private cause of action not clearly created by the statute.
The reason to distinguish cases involving enforcement actions should also be apparent, but further explanation can be helpful. State and local laws prohibit a good deal of conduct, from selling narcotics, to driving over the speed limit, to disturbing the peace, to conducting a business without a license. If a person violates such a law, the government can commence adversary proceedings to impose sanctions for the violation. When we use the- term enforcement actions, we are referring to adversary legal proceedings by a government to impose such sanctions on conduct prohibited by law. Sometimes the prohibitory law is contrary to federal law. One remedy generally recognized in that circumstance is the availability to the accused of a defense in the adversary proceeding that the law allegedly violated is preempted by federal law. For example, in Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), a person accused of loitering under a Louisville ordinance successfully defended himself on the ground that the loitering law was too vague to satisfy federal due process. Given the uniform precedent in permitting such a defense, one might infer that the defense is compelled by the Supremacy Clause. But that precedent can readily be explained on the ground that it is almost always reasonable to infer from the federal law at issue that it is intended to be available as a defense to enforcement of state or local law. As in Thompson, permitting the defense may be the only way .to effectuate the federal law. And the “equities” weigh heavily in favor of one who is being prohibited from engaging in conduct that, under the Supremacy Clause, is lawful.
It is important to recognize, however, that even in this circumstance there may be exceptions. What if, for example, the federal statute prohibited its use as a defense? Say, Congress, in an effort to assist the trucking industry, enacted a statute providing that a State receiving federal highway funds could not impose a speed limit under 80 miles per hour on rural parts of interstate highways. Assume further that a federal agency could withhold highway funds from States that did not comply with the speed-limit requirement. To avoid confusion that could endanger those traveling on interstate highways, however, the statute included a proviso that forbade anyone from defending against a speeding ticket on the ground that the posted speed limit on a highway was below federal requirements. Could a driver still invoke the Supremacy Clause as a defense to enforcement of a state speed limit? Certainly not. The Supremacy Clause is the law, but it does not amend federal legislation to contradict congressional intent. Recognizing the driver’s defense would infringe the authority of Congress, not effectuate it. Congress obviously decided that its purposes could best be advanced by limiting the sanctions against contrary state laws to those provided by the power of the purse.
Nevertheless, we can generally presume that a person accused in a state or local enforcement action of engaging in prohibited conduct is entitled to defend against the charge on the ground that the conduct is protected under federal law.[3] When that is so, we can also generally presume that a person likely to face such an enforcement action may proceed in federal court to *830 enjoin enforcement insofar as it is contrary to federal law. As Justice Kennedy has written, an anticipatory action to enjoin enforcement of state law is “nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State’s enforcement proceedings at law.” Va. Office for Prot. & Advocacy v. Stewart, — U.S. -, 131 S.Ct. 1632, 1642, 179 L.Ed.2d 675 (2011) (Kennedy, J, concurring). To be sure, a person who seeks injunctive relief already has one remedy available — if enforcement proceedings begin, federal law can be used as a defense. But that remedy may be ineffectual because the threat of enforcement itself can be disabling; enforcement proceedings may never need to be initiated because the person may decide to halt the. conduct to avoid the risk. In that circumstance the injunctive remedy may serve an important purpose and does not interfere with any other remedy. Once enforcement proceedings begin, however, an injunction is ordinarily unavailable, both because the “defense” remedy is available and because permitting injunctions against ongoing enforcement actions could greatly impair important state interests. See Younger, 401 U.S. at 44-45, 91 S.Ct. 746; Sprint Comm’ns, Inc. v. Jacobs, — U.S. -, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013). Thus, the preemption defense and injunctive relief serve as complementary means (really, two forms of the same remedy) for effectuating federal law when other means are likely unavailable.
Moreover, once the courts recognize a federal preemption defense to an enforcement action, allowing suits to enjoin state enforcement does not increase the risk of nonuniform interpretation of federal law. Yes, multiple courts will have the authority to interpret federal law in deciding whether to grant an injunction. But multiple courts already have the authority to interpret the federal law in deciding whether that law provides a preemption defense to state enforcement action.
It should be plain that the compelling reasons not to recognize a private cause of action for injunctive relief under Title X are inapplicable (or at least of much less weight) when a court is considering an injunction against a state or local enforcement action based on preemption by federal law not enacted under the Spending Clause. Unlike the present suit to enjoin § 107(0, such suits for injunctive relief are a component of what is probably the only means of effectuating the federal law (the combination of the preemption defense and injunctive relief); centralized uniformity of interpretation of the federal law is impossible (at least until a Supreme Court ruling); the state is prohibiting conduct, not just refusing to subsidize it; and the remedy is a traditional one.
We now turn to an examination of the cases that Planned Parenthood asserts to be binding precedent contrary to our conclusion. It is useful to begin with a lesson from Chief Justice Marshall on how to read precedent. He wrote:
It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent -suit when the very point is presented for decision.
Cohens v. Virginia, 6 Wheat. 264, 19 U.S. 264, 399, 5 L.Ed. 257 (1821).
The path of the law is not a straight line. It would be a wooden jurisprudence if every general statement by a court were set in stone. Every lawyer (and certainly every judge) knows that factual circumstances and arguments (that is, insights) may be presented that were not anticipat *831 ed or considered by the court issuing the original opinion. We should not read into an opinion more than the author wrote into it. When courts are presented with new facts or new arguments, they regularly, and properly, decide to qualify general rules or recognize exceptions.
Of course, revisions to precedents can be taken to extremes. Because no two cases are identical, we could always say we are not bound by precedent because of differences between the facts in the precedent and in the case before us. But there needs to be a good reason on which to distinguish a precedent. And the need for a good reason increases in proportion to the extent to which the precedent has analyzed and elaborated on the issue. By that standard, it is easy to see that in this case we are not bound by any precedent of the United States Supreme Court or this court. No binding opinion has addressed the factors that we find compelling in this case — the federal statute’s origin in the Spending Clause and the absence of an enforcement action. Indeed, in not one of the allegedly precedential decisions cited by Planned Parenthood was the existence of a Supremacy Clause cause of action for injunctive relief a disputed issue, and statements regarding the existence of such a cause of action (which appear in only a couple of the cases) were brief and not supported by substantial analysis.
We begin with the Supreme Court “precedents” cited by Planned Parenthood. Most striking, a number of these cases (unavailability of the records keeps us from knowing precisely how many) were brought under 42 U.S.C. § 1983, which independently provides a right to obtain injunctive relief, mooting whether the Supremacy Clause does the same. See Wilder v. Virginia Hospital Ass’n, 496 U.S. 498, 501, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); Wright v. City of Roanoke Redevelopment & Housing Authority, 479 U.S. 418, 419, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); Shea v. Vialpando, 416 U.S. 251, 257, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) (see Brief for Appellants Alexander, Alexander v. Swank, No. 70-5032, 1971 WL 134144, at *2 (S.Ct.1971)); King v. Smith, 392 U.S. 309, 311, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).
In other cited cases we cannot discern the source of the cause of action because the Court does not address the matter; certainly none of the opinions state that the source was the Supremacy Clause. In Arkansas Department of Health & Human Services v. Ahlborn, 547 U.S. 268, 292, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006), there is no mention of the Supremacy Clause in the Court’s unanimous opinion, nor is there any mention of the Clause in the district-court or circuit-court opinions in the case. In Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), the source of the cause of action was apparently not a matter of contention because the opinion contains no discussion of whether a cause of action exists. In Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), the Court denied relief, so the opinion could not. be a precedent for the existence of a cause of action. And Jones v. T.H., 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976), was a summary affir-mance with no discussion of the basis of the cause of action. See Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182-83, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (discussing the very limited precedential effect of a summary affir-mance).
Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), is sometimes cited as supporting the exis *832 tence of a Supremacy Clause cause of action. But it addressed only whether there was federal jurisdiction, not the existence of a cause of action, in a case involving an injunction against a state law prohibiting discrimination. The existence of a cause of action is a distinct question from whether there is jurisdiction to consider a claim. See Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (“Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.”). This point was made clear in another opinion relied on by Planned Parenthood. Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), held that the federal courts had jurisdiction to hear the case. But in response to the argument that there was no private cause of action, the Court said that jurisdiction required only an arguable, not a valid, cause of action, so it did not need to decide if a cause of action actually existed. See id. at 642-43, 122 S.Ct. 1753. Similarly, Lawrence County v. Lead-Deadwood School District No. 40-1, 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985), was a review of a state-court mandamus action and contained no discussion of the propriety of the cause of action; a footnote cited by Planned Parenthood criticizes a federal circuit court for holding that it lacked jurisdiction to hear a case raising the same claim, but the Court said nothing about whether there would have been a proper cause of action in federal court, see id. at 259 n. 6, 105 S.Ct. 695.
Finally, in Pharmaceutical Research & Manufacturers of America v. Walsh, 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003), the Court affirmed the circuit court’s reversal of a preliminary injunction against a state law without addressing whether the plaintiff had a cause of action. Justice Thomas’s concurrence pointed out that the respondents had failed to argue that the petitioner was “not entitled to bring a preemption lawsuit as a third-party beneficiary to the Medicaid contract.” Id. at 683, 123 S.Ct. 1855.
We note that the dissent also cites Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), as rejecting our view when it stated that “a claim of federal preemption does not always arise as a defense to a coercive action,” id. at 12 n. 12, 103 S.Ct. 2841. But the cases cited by the Court as illustrations of that proposition, see id. at 20 n. 20, 103 S.Ct. 2841, make clear that all the Court was saying is that preemption can be raised not only as a defense but also in suits for injunctions or declaratory judgments. It was not deciding when it can be a basis for injunctive relief, and it was hardly saying that preemption always provides a cause of action for injunctive relief. As for the dissent’s citation of Virginia Office for Protection & Advocacy v. Stewart, - U.S. -, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011), the only issue before the Court was the scope of the exception to the Eleventh Amendment recognized in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The existence of a cause of action was not addressed. Suggesting caution in reading too much into the opinion is that the author was Justice Scalia, who less than a year later joined the dissent in Douglas.
The Supreme Court has told us that even on questions of jurisdiction, which courts always have a duty to consider, precedent is not established by the Court’s decision to hear a case if the Court does not address the issue of jurisdiction. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 91, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (“drive-by jurisdictional rulings *833 ... have no precedential effect”). A forti-ori, cases that do not consider whether a cause of action under the Supremacy Clause exists do not create precedent on the issue. It is hardly unusual for the Court to assume, without deciding, the existence of a cause of action that has not been challenged. See, e.g., Lake Country Estates, Inc. v. Tahoe Reg’l Planning Agency, 440 U.S. 391, 398, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).
Turning to the decisions of this court, the earliest three opinions cited by Planned Parenthood as precedential did not address the possibility of causes of action under the Supremacy Clause. In Planned Parenthood v. Dandoy Ass’n of Utah, 810 F.2d 984 (10th Cir.1987), the suit was brought under 42 U.S.C. § 1983, which unquestionably allows for injunctive relief. See Planned Parenthood Ass’n of Utah v. Dandoy, 635 F.Supp. 184, 186 (D.Utah 1986) (stating that case was brought under § 1983). In Jane Does 1 Through 4 v. Utah Department of Health, 776 F.2d 253 (10th Cir.1985), the opinion made no mention of the basis of the cause of action, did not mention the Supremacy Clause, and stated, “We do not see a preemption issue in this case,” id. at 256. And in Hern v. Beye, 57 F.3d 906 (10th Cir.1995), the court also did not discuss the basis of the cause of action and did not mention the Supremacy Clause.
That leaves us with the two of our opinions on which Planned Parenthood places its principal reliance: Edmondson, 594 F.3d 742, and Qwest Corp., 380 F.3d 1258. But as opinions that purportedly have definitively resolved the issue before us, they are remarkably short on discussion. In neither was the existence of a Supremacy Clause cause of action disputed. And of particular importance, neither involved Spending Clause legislation and both involved relief from enforcement actions.
Edmondson dealt with the issue in a footnote stating that one of the defendants had challenged the plaintiffs’ right to bring suit under 42 U.S.C. § 1983 but had not challenged the plaintiffs’ invocation of the Supremacy Clause. It then quoted Qwest as follows: “We have held that ‘[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.’ ” 594 F.3d at 756 n. 13. That is the sum of the court’s discussion and analysis on an issue not contested by the parties. Of course, a short holding is as binding as a long one. But the point here is that the parties had not sought a ruling on the issue, the issue was not argued in the briefs, and the court certainly had no occasion to consider the full .extent, of when the general rule would apply. Our holding in this case is limited to a claim for injunctive relief under the Supremacy Clause when the allegedly preempting federal law is a statute enacted under the Spending Clause and the injunction sought is not to halt an enforcement action. In Edmondson the preempting statute was the federal Immigration Reform and Control Act (not Spending Clause legislation) and the injunctive relief affirmed by the panel was to halt enforcement action.[4] It would be to adopt a *834 formalism inconsistent with our duties as judges to say that the sentence in Edmondson forecloses our authority to recognize an exception to the general rule stated in Edmondson for the very different circumstances present in this ease.
The discussion in Qwest was not significantly longer. It consisted of four conclu-sory sentences, citing decisions by two other circuits. See'id. at 1266. There was no need for any additional analysis because no one disputed the existence of a cause of action. In its reply brief on appeal, the City of Santa Fe argued for the first time that the district court lacked jurisdiction because there was no federal-question jurisdiction to hear the request for an injunction. The Qwest opinion dealt with the jurisdictional issue in a footnote. See 880 F.3d at 1264 n. 1. As explained above, the existence of jurisdiction is quite different from the existence of a cause of action. See Bell, 327 U.S. at 682, 66 S.Ct. 773.
The statement in Qwest regarding a Supremacy Clause cause of action was not in response to a question raised by a party about whether a cause of action existed. No such question was raised. Rather, the statement appeared in a discussion addressing Qwest’s (losing) argument that it had a personal right under 47 U.S.C. § 253 that was enforceable under § 1983, so it could recover attorney fees under 42 U.S.C. § 1988(b). The statement was background used by the panel majority to argue that some comments by Senators in the Congressional Record did not indicate that the Senators intended to create a personal right. See 380 F.3d at 1265-66. Indeed, our analysis did not require that there actually be a private right to injunc-tive relief but only that the few Senators whose statements had been relied on (by courts reaching a different result from ours on the § 1983 issue) believed that there was such a private right of action.
Ironically, our Qwest opinion recognized that the existence of a private right of action under a federal statute may be affected by whether the statute is Spending Clause legislation. In analyzing whether § 253 created a right enforceable through § 1983, we applied the test set forth by the Supreme Court in Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309. We noted that Gonzaga, unlike Qwest, involved Spending Clause legislation, and that the Supreme Court had been reluctant to interpret such legislation as creating federal rights; but we assumed, without deciding, that the Gon-zaga test applied because the parties had agreed that it did. See Qwest, 380 F.3d at 1265 m 2. Presumably the Qwest court would not have thought it untoward to consider whether to distinguish Spending Clause legislation from other legislation with regard to whether it created a cause of action for damages. The same should be true for a cause of action for injunctive relief.
Again, Qwest had no occasion to consider whether there is a private cause of action for an injunction under the Supremacy Clause when the allegedly preempting statute is Spending Clause legislation and the injunction is not to halt enforcement *835 action. The injunction in Qwest was founded on the Federal Telecommunications Act of 1996, not enacted under the Spending Clause. And, as set forth in the footnote,[5] the injunction in Qwest was described by the plaintiff, and is best understood, as an injunction against enforcement proceedings.[6]
We do not dispute that Edmondson and Qwest are binding precedent for the contexts in which those cases arose. But the case before us, unlike Edmondson and Qwest, involves Spending Clause legislation. And Planned Parenthood is not facing a potential enforcement action — an adversary legal proceeding to impose a sanction for engaging in prohibited activity. After all, § 107(0 does not prohibit Planned Parenthood from doing anything. It does not say that all health-care providers must offer comprehensive care. It does not even prohibit those who do not offer comprehensive care from providing family-planning services. Planned Parenthood can continue to do so. The statute says only that the State will not subsidize family-planning services provided by those who do not offer comprehensive care.
Were we to say that Edmondson and Qwest, in which no party challenged the existence of a Supremacy Clause cause of action, are binding precedent that such a cause of action is available even in very different contexts, we would be unfaithful to Chief Justice Marshall’s maxim that “general expressions” in an opinion that “go beyond the case ... may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.” Cohens, 19 U.S. at 399, 19 U.S. 264. Because we do not *836 believe that Title X contemplates enforcement through private suits for injunctive relief and because the office of the Supremacy Clause is to effectuate federal statutes, not contravene them, we hold that Planned Parenthood is without a cause of action to assert its Supremacy Clause claim.[7]
2. Waiver
Planned Parenthood argues that Moser has waived the issue of wheth *837 er it has a cause of action for injunctive relief under the Supremacy Clause. Planned Parenthood may be correct. Although Moser’s opening brief directed our attention to the Douglas issue and we questioned Planned Parenthood about the matter at oral argument, Moser did not press the point in his briefs as we expect a party to do if it wishes us to decide an issue. Waiver, however, binds only the party, not the court. A party that waives an issue is not entitled to have us consider and rule on it. But it is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment.
In United States National Bank v. Independent Insurance Agents of America, Inc., 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), the Supreme Court addressed the petitioner’s argument that the court of appeals had improperly considered an argument (that Congress had repealed the statute permitting certain banks to sell insurance) not raised by the respondents in the circuit court in their opening brief or even at oral argument, despite that court’s invitation, see id. at 445, 113 S.Ct. 2173. Indeed, in response to the circuit court’s orders for supplemental briefing, the respondents did not take a position on the merits. See id. But the Court wrote, “[Wjhen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.” Id. at 446, 113 S.Ct. 2173 (internal quotation marks omitted). In language particularly pertinent here, the Court said that “a court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief.” Id. at 447, 113 S.Ct. 2173 (ellipsis and internal quotation marks omitted). The Court held that the circuit court had not abused its discretion in raising and addressing the issue. See id. at 447, 113 S.Ct. 2173. But it reversed on the merits unanimously.
It is not hard to find examples of appellate courts raising issues sua sponte, although sometimes the opinion does not mention that the court did so. An en banc Ninth Circuit recently pronounced that it “may consider an issue that has not been adequately raised on appeal if such a failure will not prejudice the opposing party.” United States v. Cotterman, 709 F.3d 952, 960 (9th Cir.2013). It found no prejudice in that case because it had “called for and received supplemental briefs by both parties.” Id. (internal quotation marks omitted). The Fifth Circuit did the same in United States v. Key, 599 F.3d 469, 474 (5th Cir.2010). And we disposed of an appeal on an unraised antecedent issue in Hanson v. Wyatt, 552 F.3d 1148 (10th Cir.2008), although it would have been better if we had requested supplemental briefing.
Sometimes it may even be improper not to consider an issue waived by the parties. Certainly when the opposing parties both agree that a contract is unambiguous (but they differ on the meaning), we should be able to decide otherwise. And we think it significant that Justice Stevens (joined by Justice Marshall) once wrote a dissent faulting the majority, which held that the Federal Arbitration Act (FAA) compelled arbitration of an employment claim, because it had not addressed the unraised (except by amici) question of whether the FAA extends to employment disputes, a question “clearly antecedent to disposition of this case.” Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 37, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (Stevens, J., dissenting). Justice Stevens pointed out that already in that term of court, “the Court ha[d] on at least two occasions de *838 cided cases on grounds not argued in any of the courts below or in the petitions for certiorari.” Id.
We are comfortable with the propriety of our addressing the cause-of-action issue. Whether there is a cause of action under the Supremacy Clause for injunctive relief is certainly a question antecedent to whether injunctive relief is proper in a particular case.[8] We see no unfairness to Planned Parenthood given the opportunity we have provided for it to submit two briefs on the subject. And we think this issue is sufficiently substantial and important to demand our attention. At least four members of the Supreme Court appear to believe that there is no cause of action in this type of case, and, as the dissent here notes, they might go further than this opinion in restricting suits for injunctive relief. To be sure, four is not a majority of the Court; but the fact that the issue is as yet undecided argues for, rather than against, consideration of an issue that has clearly grabbed the attention of the Justices.
B. First Amendment Claim
The district court also granted Planned Parenthood a preliminary injunction against implementation of § 107(i) on the ground that it infringed Planned Parenthood’s First Amendment rights. This claim was brought under § 1983, so there is no dispute that Planned Parenthood has a cause of action. We therefore address the merits.
Moser challenges the preliminary injunction, arguing that § 107(Z) contains, on its face, nothing that discriminates based on speech or association. He contends that the law neither conditions eligibility for a Title X subgrant on the relinquishment of First Amendment rights, nor punishes entities for exercising such rights. Planned Parenthood argues in response that § 107(£) imposes an unconstitutional condition because it penalizes the exercise of Planned Parenthood’s rights “to associate with entities that provide abortions and to advocate for access to abortion services.” Aplee. Br. at 24. We agree with Moser.
We begin by stating our understanding of the unconstitutional-conditions doctrine. Under the “modern unconstitutional conditions doctrine ... the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit.” Bd. of Cnty. Comm’rs v. Umbehr, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (ellipsis and internal quotation marks omitted). To do so, the Supreme Court has explained, “would allow the government to produce a result which it could not command directly.” Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (brackets and internal quotation marks omitted). The Court has applied this doctrine in two distinct contexts.
First, the doctrine has been applied when the condition acts prospectively in statutes or regulations that limit a government-provided benefit — typically a subsidy or tax break — to those who refrain from or *839 engage in certain expression or association. See, e.g., FCC v. League of Women Voters, 468 U.S. 364, 366, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (federal statute that forbids recipients of public-broadcasting subsidy from “engaging] in editorializing” (internal quotation marks omitted)); Speiser v. Randall, 357 U.S. 513, 515, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (state constitutional provision and effectuating statute that grant tax exemption only to veterans who pledge not to advocate overthrowing the government). These cases recognize that the government ordinarily can impose conditions on the receipt of government funding, but that conditioning a benefit on someone’s speech or association achieves an effect similar to direct regulation of the speech or association. See Rumsfeld v. Forum for Academic & Institutional Rights, 547 U.S. 47, 59, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). These cases have addressed only conditions explicitly imposed by the law.
Second, the unconstitutional-conditions doctrine has been applied when the condition acts retrospectively in a discretionary executive action that terminates a government-provided benefit — typically public employment, a government contract, or eligibility for either — in retaliation for prior protected speech or association. See, e.g., Umbehr, 518 U.S. at 671, 116 S.Ct. 2342 (termination of independent contractor by county officials in retaliation for contractor’s criticism of county board); Perry, 408 U.S. at 597, 92 S.Ct. 2694 (nonrenewal of professor’s contract with state university by board of regents in retaliation for his criticizing the board). In these cases, the government official’s action has not been compelled by a statute or regulation; rather, the challenged action is one that would be within the official’s discretion if it were not taken in retaliation for the exercise of a constitutional right. Thus, these cases necessarily examine the official’s motive for taking the action; the challenge will be rejected unless retaliation against the protected conduct was “a substantial or motivating factor” for taking the action and the official would not “have taken the same action ... in the absence of the protected conduct.” Umbehr, 518 U.S. at 675, 116 S.Ct. 2342.
Neither of these contexts is present here. The first is absent because nothing in § 107(Z) prohibits subgrantees — or even their officers or employees — from advocating abortion rights or associating with abortion providers. Nor does any advantage accrue to a potential recipient by its advocacy against abortion. Planned Parenthood could qualify under the statute if it expanded its services to satisfy the requirements to be an FQHC. It does not dispute that, on its face, § 107(Z )’s scheme of prioritizing funding to public entities and full-service healthcare providers does not discriminate in funding based on a potential recipient’s speech or association.
Rather, Planned Parenthood attempts to fit its claim within the second category of cases, those in which a person is penalized by discretionary executive action for prior speech or association. It asserts that § 107(Z) violates the First Amendment “by imposing a penalty on [Planned Parenthood’s] association or affiliation with, abortion services.” Aplt. App., Vol. I at 21. And to show that § 107(Z) imposes a penalty, it attempts to show the motive for enactment of the measure. It points to the following evidence: (1) a declaration by a Planned Parenthood employee that she heard members of both houses of the Kansas legislature refer to § 107(Z) as the “ ‘Planned Parenthood’ provision” and heard Representative Lance Kinzer, who introduced the measure, confirm during floor debates that it “was designed to de-fund Planned Parenthood,” id. at 62-63; (2) a press release from Kinzer’s office *840 stating that § 107(£) “took all state funding away from Planned Parenthood to ensure that state dollars are not used for abortion services,” id. at 196; (3) a substantially identical release from the Speaker of the House Mike O’Neal, id. at 197; (4) a post by Kinzer on his Facebook page hailing the passage of his “floor amendment to deny Title X funding to Planned Parenthood for the balance of FY2011,” id. at 199; and (5) a news article quoting a spokesperson for the Governor stating that “Gov. Brownbaek, along with the overwhelming majority of Kansans, opposes taxpayer subsidy of abortions,” id., Vol. II at 202 (internal quotation marks omitted).
But Planned Parenthood cites no Supreme Court or Tenth Circuit authority for expanding the second category of unconstitutional-condition cases — those in which adverse discretionary executive action was motivated by the plaintiff’s speech or association — to legislative enactments. Indeed, we are bound by Supreme Court precedent not to consider the motives of lawmakers to determine whether legislation that imposes no burden on speech (or expressive conduct) or association was enacted to penalize speech or association.
United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), considered the 1965 amendment to the Universal Military Training and Service Act of 1948 to impose criminal penalties on anyone who “knowingly destroys [or] knowingly mutilates ” a draft card. Id. at 370, 88 S.Ct. 1673 (internal quotation marks omitted). The defendant was convicted of violating the statute after he burned his draft card “publicly to influence others to adopt his antiwar beliefs.” Id.
O’Brien is best known for setting forth the test for determining the constitutionality of a statute that restricts expressive conduct. See id. at 377, 88 S.Ct. 1673 (“A government regulation [of expressive conduct] is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.”); see also Texas v. Johnson, 491 U.S. 397, 407-20, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (invalidating state flag-burning statute because one of state’s asserted interests was not implicated on the facts of the case and the other was related to the suppression of expression). The statute satisfied that test. See O’Brien, 391 U.S. at 382, 88 S.Ct. 1673.
But the Court then considered the argument that the statute was unconstitutional because Congress’ “purpose” was “to suppress freedom of speech.” Id. at 382-83, 88 S.Ct. 1673 (internal quotation marks omitted). The Court rejected the argument as illegitimate, relying on the “familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.” Id. at 383, 88 S.Ct. 1673. It set forth three reasons for that practice. First, determining the motives of all, or even a majority, of a legislative body is fraught with difficulty. As the Court explained:
Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress’ purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled crite *841 ria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.
Id. at 383-84, 88 S.Ct. 1673 (footnote omitted). Second, the Court noted the futility of striking down a statute “which could be reenacted in its exact form if the same or another legislator made a ‘wiser’ speech about it.” Id. at 384, 88 S.Ct. 1673. Third, it expressed reluctance to invalidate — “essentially on the ground that it is unwise legislation” — a beneficial law because of the tainted process by which it was enacted. Id.; see John Hart Ely, Legislative & Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1212-16 (1970) (characterizing the Court’s three reasons for refusing to rely on legislative motive as ascertainability, futility, and disutility).
As' here, the plaintiff in O’Brien relied primarily on the statements of three lawmakers, the only ones to speak diming floor debate. But the Court downplayed the importance of the statements, saying that “[t]here was little floor debate on [the challenged] legislation in either House,” the statute having passed after only a “brief statement” by one senator and statements by two congressmen. O’Brien, 391 U.S. at 385, 88 S.Ct. 1673. It added that although the Senate and House Armed Services Committee reports had made “clear a concern with ‘defiant’ destruction of’ draft cards, “both reports also indicate[d] that this concern stemmed from an apprehension that unrestrained destruction of cards would disrupt the smooth functioning of the Selective Service System.” Id. at 385-86, 88 S.Ct. 1673. Although one might argue that the statements by the supporters of § 107(?) are more probative of legislative purpose than were the statements regarding the draft-card statute, the bottom line of O’Brien was not the weakness of the evidence but its irrelevance.
We recognize that the Supreme Court has considered legislative motive or purpose in assessing whether a statute is valid under the Establishment Clause and the Equal Protection Clause. See Edwards v. Aguillard, 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (invalidating law under Establishment Clause based on state’s lack of a legitimate secular purpose); Wallace v. Jaffree, 472 U.S. 38, 59, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (same); Hunter v. Underwood, 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (invalidating state constitutional provision under Equal Protection Clause based on racially discriminatory motive and impact); Crawford v. Bd. of Educ. of L.A., 458 U.S. 527, 543-45, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982) (rejecting equal-protection challenge to state constitutional amendment limiting state court-ordered busing on ground that it was not adopted with a discriminatory purpose); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-67, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (rejecting equal-protection challenge to city’s rezoning decision on ground that the challengers failed to carry their burden of proving that racially discriminatory purpose was a motivating factor).[9] But Planned Parenthood *842 has not pointed to any decision of the Supreme Court that has invalidated a statute containing no explicit restriction on speech (or expressive conduct) or association on the ground that the “motive” of the legislature was to penalize a person for the person’s speech or association.
On the contrary, after the decisions cited in the prior paragraph the Supreme Court has reiterated in the context of a First Amendment retaliation claim that a court cannot inquire into a legislator’s motives. Bogan v. Scott-Harris, 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998), presents a clear contrast to the Court’s decision less than two years earlier in Umbehr. In Umbehr the Court had held that an independent contractor could sue two members of the board of county commissioners who had allegedly terminated his government contract in retaliation for his criticism of the county and the board. See 518 U.S. at 670-78, 116 S.Ct. 2342. The Court applied to independent government contractors essentially the same protection provided to public employees.
In Bogan the government conduct was quite similar to that in Umbehr, except that the alleged retaliation took the form of legislation rather than executive action. The city had adopted an ordinance eliminating the city’s Department of Health and Human Services, of which plaintiff was the sole employee. Plaintiff alleged that her department was eliminated in retaliation for her filing a complaint against another city employee, an action protected by the First Amendment. In ruling that the defendant mayor and city councilor were protected from liability by absolute legislative immunity, the unanimous Court noted that it “is ‘not consonant with our scheme of government for a court to inquire into the motives of legislators.’ ” Bogan, 523 U.S. at 55, 118 S.Ct. 966 (quoting Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)).[10] If such inquiry is improper in the Bogan context, we fail to see how it could be proper here.
Even if we were not bound by O’Brien and Bogan, we would be most reluctant to expand the statutory-motive cases to the arena of freedom of speech and association. The implications of doing so are daunting. Planned Parenthood’s theory raises the prospect of every loser in a political battle claiming that enactment of legislation it opposed was motivated by hostility toward the loser’s speech. That is essentially what Planned Parenthood argues here. Planned Parenthood favors abortion rights. At least some influential Kansas lawmakers take a contrary view. If they act on that view to favor legislation opposed by Planned Parenthood, is the statute to be struck down as violating Planned Parenthood’s First Amendment rights? If Congress imposes a tax on oil companies, is the tax to be voided because *843 supporters of the tax said they dislike Big Oil or because those impacted by the tax contributed to losing campaigns challenging legislators who later voted for the-tax? Must courts decide in cases such as this whether legislators were motivated to punish Planned Parenthood’s speech and association, or were opposed to providing funding to an organization that also provides abortion services, or were simply in favor of family-planning services associated with full-service medical care? We think not. We reject, the notion that Planned Parenthood can challenge § 107(i) as an unconstitutional condition solely on the ground that its passage was motivated by a desire to penalize Planned Parenthood’s protected speech and association.
We hold that Planned Parenthood’s First Amendment claim lacks merit.
III. CONCLUSION
We REVERSE and. REMAND to the district court with instructions to vacate its preliminary injunction and proceed consistently with this opinion.

. On June 1, 2012, Kansas Governor Sam Brownback signed into law Section 82(k) of House Substitute for Senate Bill No. 294, a funding provision that reenacted the restrictions on Title X funding contained in Section 107(1), applying it to the upcoming fiscal year. See 2012 Kan. Sess. Laws 2022; 31 Kan. Reg. 861 (June 7, 2012). On June 29, 2012, the district court extended its preliminary injunction to apply to and enjoin enforcement of Section 82(k). The appeal of this injunction is case No. 12-3178. On June 28, 2013, the district court again extended its preliminary injunction, this time to apply to and enjoin enforcement of Section 131(k) of Senate Bill No. 171, passed by the Kansas legislature in 2013. The appeal of this injunction is our case No. 13-3175. These two appeals have been consolidated with the appeal of the Section 107(1) injunction in case No. 11-3235; our reasoning applies to all three appeals.

. As noted in Part 11(A)(2) .below, there is a substantial question whether Moser adequately raised in his original briefs the argument that Planned Parenthood lacks a cause of action for injunctive relief based on alleged violations of Title X. Nevertheless, this court requested and received supplemental briefs on the matter and, as explained in Part 11(A)(2), properly considers it.

. We note that Planned Parenthood has not identified any enforcement action that could be taken against it in which it could defend on the ground that § 107(Z) is preempted by fedéral law.

. The district-court injunction at issue in Edmondson involved three provisions of the Oklahoma Taxpayer and Citizen Protection Act of 2007. First, it enjoined the Oklahoma Attorney General from enforcing Section 7(B), which prohibited a contractor from contracting with a public employer unless it used a particular system to verify eligibility. We reversed that portion of the injunction. ' See Edmondson, 594 F.3d at 750. Our decision therefore cannot be characterized as affirming a cause of action in that respect. Second, it enjoined the state Human Rights Commission from enforcing Section 7(C), which made it a "discriminatory practice,” id. at 760, for an employer to discharge an employ *834 ee while retaining another employee that the employer knew or should have known was an unauthorized alien. See id. at 758, 760, 765 (describing the Act's remedies — cease-and-desist orders, reinstatement, back pay, costs, and attorneys’ fees — as " 'sanctions' ”). This was certainly an injunction against potential enforcement action. Third, the district-court injunction enjoined the state Tax Commission from enforcing Section 9, which, as characterized by our decision, imposed "a regulatory penalty, not a tax,” on "contracting entities that do not verify eligibility [under the immigration laws] or withhold taxes from their independent contractors.” Id. at 763. Again, this was an injunction against potential enforcement action.

. Qwest's complaint alleged, and the City’s answer admitted, that failure to comply with the Santa Fe ordinance would subject Qwest to criminal and civil penalties. See Compl. (Qwest v. City of Santa Fe, No. CIV 00 795 LH (D.N.M. June 1, 2000)), and City of Santa Fe’s Answer to PL’s Compl. dated June 1, 2000 {id., June 22, 2000). The context of the case is important. Qwest had a state license requiring it to serve anyone requesting service within Santa Fe and forbidding it from terminating service without state-agency permission. See Qwest Corp. v. City of Santa Fe, 224 F.Supp.2d 1305, 1308 (D.N.M.2002). It had been operating under a continuing franchise agreement with the City, which, in exchange for a 2% franchise fee, let Qwest use City rights-of-way to provide services. See id. But then Santa Fe adopted an ordinance imposing various burdens on telecommunications carriers (such as a requirement to enter into a costly lease for each City right-of-way being used). Qwest claimed that the ordinance violated federal law barring local laws that "prohibit or have the effect of prohibiting” a telecommunications carrier from providing service, 47 U.S.C. § 253(a), because Qwest would be subject to penalties if it continued to provide telecommunications service as it had in the past (that is, servicing anyone requesting services within Santa Fe, as permitted by the franchise giving it access to City rights-of-way and as required by the state license) without complying with the new, burdensome provisions of the ordinance. Qwest's concern was that Santa Fe was effectively prohibiting it from providing telecommunications service. The district court "enjoined [the City and its agents] from taking any enforcement action against Qwest” based on various sections of the ordinance. Qwest Corp., 224 F.Supp.2d at 1332 (emphasis added).

. The dissent says that Qwest is like this case in that Qwest could have sought review under the APA. Perhaps Qwest could have found a way to obtain a final order from the FCC that would have been reviewable under the APA. But that consideration was never addressed by the court and parties in Qwest. Indeed, Qwest appears to agree with two circuit decisions cited by the opinion as stating that the FTC does not have authority to enforce preemption claims relating to local-government management of public rights-of-way, the very type of preemption claim raised in Qwest. See 380 F.3d at 1265-66. In any event, the availability of APA review is only one factor in deciding whether Congress intended to allow a private suit for an injunction.

. The dissent cites ten opinions from other circuits as support for a preemption cause of action for injunctive relief. But none weaken our analysis. Pharmaceutical Research & Manufacturers of America v. Concannon, 249 F.3d 66, 73 (1st Cir.2001), aff'd by Pharmaceutical Research & Manufacturers of America v. Walsh, 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003), addressed only standing, did not rely on any Supreme Court preemption cases, and held that the state law was not preempted (so any statement about the existence of a cause of action would be dictum). St. Thomas — St. John Hotel & Tourism Ass’n v. Government of United States Virgin Islands, 218 F.3d 232, 241 (3d Cir.2000), addressed only jurisdiction (with at most one sentence suggesting the existence of a cause of action), and held that the local law was not preempted. The only Supreme Court case relied on by Western Air Lines, Inc. v. Port Authority, 817 F.2d 222, 225-26 (2d Cir.1987), was City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), which did not address whether there was a cause of action; and Western Air Lines held that the local law was not preempted. Lankford v. Sherman, 451 F.3d 496, 509 (8th Cir.2006), suggested the existence of a preemption cause of action but it relied only on language in Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), which appeared to address only the scope of 42 U.S.C. § 1983. Wright Electric, Inc. v. Minnesota State Board of Electricity, 322 F.3d 1025, 1028-29 (8th Cir.2003), addressed only subject-matter jurisdiction (relying on Shaw, 463 U.S. at 96 n. 14, 103 S.Ct. 2890 for support), and held that the local law was not preempted. Lewis v. Alexander, 685 F.3d 325, 345-46 & n. 20 (3d Cir.2012), held that there was a cause of action, but the only Supreme Court decision on which it relied (calling it "binding precedent”) was Shaw, which, as we have explained, addressed only jurisdiction. Pharmaceutical Research & Manufacturers of America v. Thompson, 362 F.3d 817, 819 n. 3 (D.C.Cir.2004), held that the state law was not preempted, but it said that there was a cause of action, relying on Walsh, 538 U.S. 644, 123 S.Ct. 1855. The court said that "[b]y addressing the merits of the parties' arguments without mention of any jurisdictional flaw, the [majority of the Justices] appear to have sub silentio found no flaw,” and cited Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), for the proposition that “federal courts must ensure they have jurisdiction before considering merits.” 362 F.3d at 819 n. 3. But the existence of a cause of action is not jurisdictional, and, as we have previously noted, Steel Co. itself warned that "drive-by jurisdictional rulings ... have no precedential effect,” 523 U.S. at 91, 118 S.Ct. 1003. We should be particularly reluctant to infer that the Supreme Court implicitly decided a non-jurisdictional issue on which it did not grant certiorari. Indep. Living Ctr. of S. Cal., Inc. v. Shewry, 543 F.3d 1050 (9th Cir.2008), which ultimately (after remand to the district court and a second appeal to the Ninth Circuit) was vacated by the Supreme Court in Douglas, see Shewry, id., remanded to No. CV 08-3155 CAS (MANx), 2008 WL 3891211 (C.D.Cal. Aug. 18, 2008), aff'd sub nom. Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644 (9th Cir.2009), vacated and remanded sub. nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc., - U.S. --, 132 S.Ct. 1204, 182 L.Ed.2d 101 (2012), also relied on Shaw and Walsh, and Supreme Court decisions like City of Burbank that did not address whether there was a cause of action. Planned Parenthood of Houston & Southeast Texas v. Sanchez, 403 F.3d 324, 331-34 (5th Cir.2005), improperly based its cause-of-action ruling on Walsh, with additional improper- support from Verizon Maryland, Inc. v. Public. Service Commission of Maryland, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), which we distinguished above as addressing only jurisdiction. Finally, the dissent cites the post-Douglas opinion in United States v. South Carolina, 720 F.3d 518 (4th Cir.2013). But that case concerned an injunction against enforcing a criminal statute, an injunction fully consistent with the Douglas dissent and this opinion.

. The dissent seems to suggest that the only issues that can be termed "antecedent” are jurisdictional issues. But the issue raised by Justice Stevens’s dissent in Gilmer was quite similar to the issue here — whether the Federal Arbitration Act created a cause of action in the context of employment disputes. See 500 U.S. at 36-37, 111 S.Ct. 1647. And the "antecedent” issue in United States National Bank was whether the Comptroller of the Currency had statutory authority to permit certain national banks to sell insurance outside their communities. See 508 U.S. at 441, 113 S.Ct. 2173.

. Planned Parenthood cites cases inquiring into legislative history to interpret a statute, arguing that these cases support consideration of legislative background here. We find these cases unpersuasive. As noted above, the Supreme Court observed in O’Brien:
When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the *842 purpose of the legislature, because the benefit to sound decision-making in this circumstances is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.
391 U.S. at 383-84 (footnote omitted).

. Tenney, like Bogan, was a legislative-immunity case. But Tenney gave as the ultimate source for the proposition the early case of Fletcher v. Peck, 10 U.S. 87, 130, 6 Cranch 87, 3 L.Ed. 162 (1810), which considered a challenge to legislation predicated on the improper motives of the enactors. And both Tenney, 341 U.S. at 377, 71 S.Ct. 783, and O’Brien, 391 U.S. at 383, 88 S.Ct. 1673, pointed to the cases collected by Justice Brandeis in Arizona v. California, 283 U.S. 423, 455, 51 S.Ct. 522, 75 L.Ed. 1154 (1931), to support the proposition that "[i]nto the motives which induced members of Congress to enact the [statute], this court may not inquire.”